IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

FILED
SHELBY COUNTY
CHANCERY COURT
DEC 1 3 2010
DEWUN R. SETTLE, C & M
TIME: 1528 BY: JD

| | |
|---|---|
| HENRY NICKELL and<br>LAURA NICKELL<br><br>       Plaintiff,<br><br>vs.<br><br>BANK OF AMERICA a/k/a<br>BAC HOME LOANS SERVICING, LP<br>f/k/a COUNTRYWIDE HOME LOANS<br>SERVICING, LP; SUNTRUST BANK;<br>and COMMUNITY MORTGAGE<br>CORP.<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Docket No. - CH-10- 2232-2

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

---

TO THE CHANCELLORS OF THE CHANCERY COURT FOR THE THIRTIETH

JUDICIAL DISTRICT:

COME NOW the Plaintiffs, Henry and Laura Nickell, by and through legal counsel,

Brewer & Barlow PLC, Webb Brewer, Steve Barlow and TeShaun Moore, and file their Petition

and Complaint and state as follows:

### I. Preliminary Statement

1. Plaintiffs Henry and Laura Nickell bring this action for rescission and restitution; declaratory and injunctive relief and damages pursuant to the Tennessee Consumer Protection Act, Tenn. Code Ann. §47-18-101 *et seq* ; the Truth in Lending Act, 15 U.S.C.§ 1601, *et seq,* and Regulation Z promulgated thereunder, 12 C.F.R.§ 226, *et seq;* and common law claims of fraud in the inducement of a loan transaction, and intentional and negligent misrepresentation.

*- page 1 -*



## II. **Jurisdiction and Venue**

2. Jurisdiction is conferred on this Court by T.C.A. § 16-11-101.

3. Venue is proper in this Court as the claim arose in this District.

## III. **Parties**

4. Plaintiffs, Henry and Laura Nickell (the "Nickells", or individually "Mr. Nickell" or "Mrs. Nickell"), are citizens and residents of Memphis, Shelby County, Tennessee.

5. Defendant, BAC Home Loans Servicing, LP (hereinafter "BAC"), is a foreign, for-profit limited partnership duly authorized to transact business in the State of Tennessee.  BAC's principal office is located at 6400 Legacy Drive Plano, TX 75024 BAC's registered agent for service of process is CT Corporation System, located at 800 S. Gay Street, Suite 2021, Knoxville, TN 37929.

6. Defendant Community Mortgage Corporation (hereinafter "CMC") is a Tennessee, for-profit corporation, whose principal place office is located at142 Timber Creek Drive Cordova, TN 38018.  CMC's registered agent for service or process is L. Patrick Sandlin located at 142 Timber Creek Drive Cordova, TN 38018.

7. Defendant SunTrust Bank (hereinafter "SunTrust") is a Georgia, for-profit corporation that is duly authorized to transact business in the State of Tennessee SunTrust's principal office is located at 303 Peachtree Street Northeast, 36th Floor Atlanta, GA 30308.  SunTrust's registered agent is Susan S. Craft located at 5350 Poplar Avenue, Suite 100 Memphis, TN 38119

IV.   **Factual Allegations**

8.  On or about June 28, 1991, the Nickells, purchased their residence, 6383 Massey Hill Drive, Memphis, TN, as tenants in the entirety for $176,700.

9.  In February of 2006, the Nickells had a first and second mortgage on their home with a combined indebtedness of approximately $280,000.  They wanted to make some home improvements and believed the house was worth more than $280,000, although they did not know how much more.

10. They contacted Community Mortgage Corporation to investigate the possibility of refinancing their mortgages to finance the work.

11. The loan officer with whom they dealt suggested an equity loan of approximately $480,000 and arranged an appraisal from an appraiser she knew.

12. The appraisal report estimated the home's value to be $600,000, which was coincidentally 80% of the amount of the proposed loan.

13. Upon information and belief, Community Mortgage was operating under underwriting criteria by which they could not make a loan in excess of 80% of the value of the home.

14. Through her discussions with the Nickells and through information disclosed in the loan application process, the Community Mortgage loan officer knew that they had excellent credit and history of repaying debt. She also knew that they had income and assets to make the bank secure in the unlikely event that there was a default in payment on the loan and a deficiency after a foreclosure sale.

15. The Community Mortgage agent believed the likelihood of a deficiency was even

more remote because property values were steadily rising at the time of the loan and she likely believed that the value of the home would eventually catch up to the appraisal.

16. At the same time, upon information and belief, the agent and Community Mortgage itself had incentive to encourage the Nickells to take the largest loan possible because their fees were based upon a percentage of the amount of the loan.

17. Relying on the appraisal procured by Community Mortgage, the Nickells ultimately entered an equity loan with Community Mortgage on February 28, 2006 with a principal indebtedness of $480,000.

18. The Nickells believed they were secure in taking on this debt because they believed the property was worth $600,000 and would increase in value as a result of the renovation project.

19. SunTrust Bank acquired the mortgage from Community Mortgage.  SunTrust still services the loan; however, it appears that Bank of America now owns the mortgage.

20. Upon information and belief, SunTrust supplied capital to Community Mortgage and had an agreement in place whereby it took over certain loans from Community Mortgage that fit within its underwriting criteria.

21. SunTrust did not exercise due diligence in the process of accepting assignment of mortgage loans from Community Mortgage.

22. It has now become apparent that the appraisal procured by Community Mortgage grossly overstated the value of the property.

23. Approximately a year after the appraisal obtained by Community Mortgage, the same appraiser told the Nickells that their home's value was approximately $250,000.00

less than the appraised value.

24. This opinion came before the financial crisis that has resulted in diminution of many property values and that comparable sales in their immediate area do not reflect a general reduction in residential property values.

25. At the time of the loan, Mr. Nickell was Manager of Fuels for FedEx Corporation, and his wife was a Technical Advisor for FedEx. Like other FedEx managers, Mr. Nickell's pay was heavily dependent on the overall company performance. In January of 2009, he experienced a pay cut, losing twenty-seven percent (27%) of pay and benefits. Mrs. Nickell experienced a twenty-one percent (21%) cut as well.

26. By September 2009, Fed Ex ended Mr. Nickell's employment with the company. Since that time, the Nickells have been trying to make ends meet on approximately thirty-six percent (36%) of their 2008 income and are spending approximately sixty-two percent (62.5%) of their income on their monthly mortgage payments.

27. Recognizing that they could not afford to make mortgage payments in the long term on their reduced income, the Nickells began to try to sell their home.

28. The Nickells have had their property on the market off and on for well over a year at a listing price consistent with their "break even" point on their mortgage but haven't had a single offer.

29. Prior to putting the house on the market, they spent approximately $15,000 and worked many hours getting the house market ready. They also paid $1,000 for special advertising utilized by their listing agent.

30. When it became apparent that they would not be able to sell the property for enough to pay off the principal indebtedness on the loan, the Nickells began to try to get

approval from SunTrust Bank to sell the property for the best price the market would bear, without further recourse from the bank.

31. A bank- approved sale for less than the outstanding indebtedness on a mortgage loan is typically called a "short sale" in the real estate/ mortgage banking industries.

32. A short sale without recourse is a particularly appropriate remedy since the major reason that the Nickells owe far more than the value of their home is the grossly inflated appraisal procured by Community Mortgage.

33. SunTrust Bank is a participant in the Home Affordable Mortgage Program ("HAMP"), which is administered by a "Loss Mitigation Department" within the bank.

34. The HAMP program was initiated on March 4, 2009 to by the United States Department of Treasury as part of the Making Home Affordable Program and is designed to reduce mortgage payments and provide other relief for mortgage borrowers who are at risk of foreclosure

35. Participating mortgage servicers are provided significant financial incentives for soliciting eligible borrowers for assistance in the HAMP program.

36. For more than a year, the Nickells have tried in vain, to get approval for a short sale through various contacts with SunTrust Bank.

37. SunTrust's short sale approval process requires that an applicant for a short sale complete a very extensive financial disclosure and obtain a conditional contract for sale with a potential buyer before it will process a short sale request. It may then take ninety days, or more, to get a response to the request. Upon information and belief, SunTrust routinely tries to collect deficiencies on short sales and the extensive

financial disclosure required in its application can be used to facilitate collection of deficiencies.

38. The Nickells have been advised by real estate agents that listing their property with the designation "requires lender approval" will reduce the purchase price by approximately thirty-two percent (32%) because of the uncertainty and the slow process.

39. Because of these factors, the Nickells requested approval for a short sale under the Home Affordable Foreclosure Alternatives ("HAFA") program, which is also a part of the Making Home Affordable program and provides for short sales and deeds in lieu of foreclosure as alternatives to foreclosure.

40. The HAFA program was initiated in 2010. Like the HAMP program, participating servicers and investors are offered financial incentives to allow distressed borrowers these options.

41. Unlike SunTrust's internal short sale process, HAFA participants can give prior approval for a short sale within established parameters; can reduce a borrower's mortgage payment to thirty-one percent (31%) of their monthly income while the property is on the market; and can provide up to $3,000.00 in moving expenses for eligible families. Perhaps most importantly, servicers or investors cannot pursue deficiencies on short sales made through HAFA.

42. SunTrust has provided the Nickells with conflicting and contradictory information about the request and about its participation in the HAFA program.

43. First, the bank responded by saying it had not yet implemented its guidelines under HAFA and was not processing HAFA short sale requests.

44. Complicating the situation, it has been very difficult for the Nickells to know whether SunTrust owns their mortgage or simply services it.

45. At some point, the Nickells were led to believe that Bank of America owned the mortgage. This led the Nickells to reach out to Bank of America in their attempts to get short sale approval under the HAFA program.

46. In response to a letter from the plaintiffs' attorney, a Bank of America representative, contrary to SunTrust's assertion, denied that Bank of America owned the mortgage. Bank of America suggested that ninety-five percent (95%) of its mortgages were transferred to Fannie Mae or Freddie Mac.

47. The Nickells then tried a number of times, unsuccessfully, to locate their loan through public records available through Fannie Mae and Freddie Mac websites.

48. Bank of America refused to intervene in the matter to facilitate a HAFA short sale, saying that even if it owned the mortgage it would be in the servicer's discretion to determine whether or not to grant a short sale.

49. Subsequently, SunTrust told the Nickells that they could not process a HAFA short sale request because their loan was owned by a "private investor" that would not permit it to do a HAFA short sale.

50. The plaintiffs, through their real estate agent then submitted a "hardship letter" as requested by SunTrust, and submitted several requests for the identity of the private investor that owned their mortgage.

51. After much effort on the part of the Nickells and their agents, the Nickells were finally told that Bank of America was the "private investor" that owned their mortgage.

52. Upon information and belief, Bank of America is a participant in the HAFA program and does allow short sales, in some circumstances, on mortgages it services.

53. Throughout all of this ordeal, the plaintiffs have never failed to make full, timely mortgage payments to SunTrust.

54. In fact, the Nickells have never even made a single late payment on their mortgage in the four and a half years since the loan was made.

55. Their conscientiousness in paying their mortgage has come at great expense as they have been forced to sell possessions and use financial resources that were intended for their retirement in order to pay their mortgage.

56. Mr. Nickells profession is highly specialized and his only employment options would require him to relocate. This makes it vital that he be able to sell his home to be in a position to accept another position, if offered.

57. Moreover, because his profession involves extremely high level of financial responsibility, the Nickells' outstanding credit rating is essential to his job search.

58. The primary reason that the Nickells are in the position of needing to sell their home for less than the principal indebtedness was the fraud in obtaining an appraisal that substantially overstated the value of their home.

59. They relied on the appraisal and believed they would have substantial equity in their home after making the loan. They reasonably believed that their home would be an asset securing their financial future. Although the housing market has experienced a severe downturn since the Nickells made the equity loan with Community Mortgage, proof will show that home values have not fallen substantially in the community surrounding the Nickells' home and that they have lost their home equity because of

the fraudulent appraisal.

60. According to SunTrust records as of April 2010, there was an outstanding balance of $455,192.07 on the Nickells' loan.

61. The best estimate of the Nickells' real estate agent is that a sale of their home would not cover the current amount owed on the mortgage, leaving the Nickells responsible to pay a substantial lump sum to SunTrust at any potential closing.

## V. Claims for Relief

### COUNT I: Fraud in the Inducement of the Loan Transaction

62. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

63. Community Mortgage's agents led the plaintiffs to believe that the property that was collateral for the loan was worth substantially more than it was in order to induce them to consummate a loan transaction by which they would owe more than the value of their home.

64. Upon information and belief, this was done by arranging and procuring an appraisal report that substantially overstated the property's value.

65. The plaintiffs relied on the false appraisal to their detriment and have suffered substantial financial damage as a result of their decision to accept the inflated loan that was offered to them.

### COUNT II: Violation of Regulation Z of the Truth-In-Lending Act

66. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

67. By failing to notify the plaintiffs of the change in ownership of their mortgage the

defendants have violated the provisions of Regulation Z of the federal Truth-In-Lending Act found at 12 C.F.R.§ 226.39.

### COUNT III: Violation of the Tennessee Consumer Protection Act

68. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

69. By repeatedly failing to provide the plaintiffs with information about the ownership of their loan as required by federal law and by providing them with false, inconsistent, and contradictory information about the ownership of the loan and their eligibility for consideration through the HAFA program, the defendants have stymied the plaintiffs' efforts to sell their home and have caused them to continue making full mortgage payments by depleting assets.

70. Defendants' acts, policies, and practices constitute unfair or deceptive acts or practices affecting the conduct of trade or commerce and violate the Tennessee Consumer Protection Act.

71. Defendants' violation of the Tennessee Consumer Protection Act was willful and knowing.

### COUNT IV: Breach of Contract

72. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

73. By committing the acts complained of, the defendants have breached contractual agreements with the United States Department of Treasury regarding the administration of the Making Home Affordable and HAFA programs, which contracts were clearly for the benefit of consumers like the plaintiffs.

**WHEREFORE, PREMISES CONSIDERED, THE PLAINTIFFS PRAY:**

1. That proper service issue and be served upon the Defendants requiring them to answer this Complaint and Petition.

2. That the Court issue a Temporary Injunction permitting the Plaintiffs to pay thirty-one percent (31%) of their monthly income as payment on their mortgage debt during the pendancy of this case.

3. That the Court enter an order rescinding the Promissory Note and Deed of Trust executed by the Nickells regarding the property in question in February of 2006 and requiring the plaintiffs to make restitution of the loan proceeds, with credit for all payments made toward restitution of the principal indebtedness.

4. That the Court enter a judgment against Defendants SunTrust and Bank of America in favor of Plaintiffs for damages resulting from their failure to provide the notification required by Regulation Z.

5. That the Court enter judgment, including treble damages, against Defendants SunTrust and Bank of America and in favor of Plaintiffs for willful violation of the Tennessee Consumer Protection Act.

6. That the Court enter judgment against Defendants SunTrust and Bank of America and in favor of Plaintiffs for breach of contract between the U.S. Department of Treasury and those defendants, plaintiffs being third party beneficiaries of said contracts.

7. For such further relief as the Court deems just and proper.

8. That the Plaintiffs be awarded all costs and expenses, including attorney fees, incurred as a result of this action, pursuant to Tenn. Code Ann. §47-18-101 *et seq.*

9. That the Court prohibit the Defendants from taking any action that would adversely

affect the Plaintiffs' credit rating..

      10. For such other and further relief as to which the Plaintiffs may be entitled.

Dated:  December 13, 2010.

                      Respectfully Submitted,

                      **Brewer & Barlow PLC**

By: _____
                      Webb Brewer (B.P.R. No. 009030)
                      Steven E. Barlow (B.P.R. No. 023498)
                      TeShaun Moore (B.P.R. No. 027816)
                      Attorneys for Plaintiff
                      20 S. Dudley, Suite 806
                      Memphis, TN 38103
                      (901) 866-1442